# UNITED STATES BANKRUPTCY COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| In re | : | Chapter 13 |
| | : | |
| JOHN FERRELL, SR., | : | Bankruptcy No. 04-30731DWS |
| aka John Ferrell, | : | |
| | : | |
| Debtor. | : | |
| —————————————— | : | |
| | : | |
| JOHN BORCHARDT, | : | Adversary No. 04-1034 |
| MICHELLE BORCHARDT, | : | |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | |
| JOHN FERRELL, SR., | : | |
| aka John Ferrell, | : | |
| | : | |
| Defendant. | : | |
| —————————————— | : | |

# MEMORANDUM OPINION

**BY:  DIANE WEISS SIGMUND, Chief Bankruptcy Judge**

Before the Court is the Complaint of John and Michelle Borchardt ("Plaintiffs") seeking an exception to the discharge of their claim against Debtor for damages incurred in connection with certain renovations contracted for but not performed on their residence. Plaintiffs state that they contracted with Debtor, doing business as Ferrell's Quality Contractors, LLC ("FQC"), to perform certain work on their residence, that they paid him

for the work only to discover that it had not been properly performed and/or completed and that he ultimately abandoned the project, forcing them to employ replacement contractors at a greater expense.  Plaintiffs rely on § 523(a)(2)(A) and (a)(4)[1] to contend that the resulting damages from these acts and omissions should not be discharged.  As a threshold issue, while their contractual relationship was with FQC, they argue that I should nonetheless impose liability for the claim on the Debtor personally.

## BACKGROUND

The Debtor for eighteen years has been in the contracting and business trades industry, most recently as the owner of FQC which terminated its operations in the spring of 2004. Prior to operating as FQC, he conducted the same business under the name C&J Quality Contracting but formed FQC when the "C", his wife, assumed fulltime motherhood. While in business, Debtor agreed to undertake the remodeling of Plaintiff's kitchen, the construction of a new family room and the repainting of the entire house due to fire damage. Debtor and John Borchardt ("John") had met when Debtor purchased a car from the dealership that employed John.  Learning that Debtor was a contractor, John advised him

---

[1]    The Complaint pled and the Pretrial Statement identified a cause of action under § 523(a)(6).  After hearing the testimony, Debtor moved to dismiss which I treated as a Rule 52(c) motion for judgment on partial findings.  I ruled that a cause of action had not been proven for "willful and malicious injury by the debtor to another entity or to the property of another entity" by a preponderance of the evidence.  In Kawaauhau v. Geiger, 523 U.S. 57, 118 S.Ct. 974 (1988) the United States Supreme Court held that the plaintiff must show both an intentional act and an intent that the act harm Plaintiffs.  I am unable to conclude that Debtor's conduct was motivated by any intention to harm Plaintiffs.  The fact that their injury was the inevitable consequence of his failure to perform is not sufficient.  Thus, I concluded that while the acts were intentional, Plaintiffs had not shown that they were done with the specific intent to harm Plaintiffs.

that he was unhappy with the contractor that he was trying to get to help him.  Preferring to do business with people that gave him business, John then retained Debtor on his representation that he had lots of references and photos of his work.  For that reason and the fact that Debtor had purchased four or five cars from the dealership, John assumed that Debtor was a very good contractor.  While John looked at the photos, he took no steps to secure references when an initial request for the names was not forthcoming.  Rather he went ahead, finding Debtor personable and the five or six men that he brought with him to evaluate the job appearing to do what he expected contractors to do.

The contemplated work as well as the agreed prices and applicable discounts were memorialized in a series of documents provided by FQC to Plaintiffs.  The original proposal, Exhibit P-1, incorporated by reference proposals #1009 described as the Kitchen Proposal and #1010 described as the Family Room Addition and included additional goods and services for a total price of $44,760.  A description of the work to be performed was drawn and provided to Plaintiffs.  Exhibit P-2.  As that contract price exceeded Plaintiffs' budget, Plaintiffs agreed to do certain of the work themselves and the scope of work was narrowed to include only the incorporated proposals and the installation of kitchen cabinets, countertops and appliances which Plaintiffs would supply for a total cost of $36,460.  Payment terms were $15,000 on acceptance and $10,000 upon delivery of the materials with the balance due upon completion.  Exhibit P-3 (the "Agreed Proposal").  Further negotiation reduced the amount due on delivery to $8,000 which Debtor acknowledged he received by signing the Agreed Proposal.  Id.  Similar signed receipts are evident for the payment of the $15,000 first installment which Plaintiffs stated they paid in late December and an additional

payment of $1,000 on March 23, 2004, the purpose of which Plaintiffs could not explain. Id. However, before making the $1,000 payment, John stated that he learned that the subcontractors were not getting paid, stopped payment on a check in the amount of $10,000 and paid the subs himself, directing only $3,000 to FQC.[2] It is undisputed that Plaintiffs paid FQC a total of $19,000. Debtor testified that all of the money that was provided was used to purchase materials or labor on Plaintiffs' job.[3]

Plaintiffs' dissatisfaction with FQC's performance came quickly. John stated that Debtor represented that he would have a crew of 6-7 workmen on the job site every working day, and the job would get done in one and one-half to two months. In fact the workers did not come every day and John had to implore Debtor to find out where they were. When confronted with the timeliness problem, Debtor prepared a proposed work schedule dated April 8, 2004 which projected job completion on April 30, 2004.[4] Exhibit P-5. John accepted the proposed schedule claiming he had so much money invested that he did not know where to turn.

Sometime after April 30th John had a discussion with Debtor about the money that was

---

[2] The disparity between the $8,000 acknowledged to have been received and the $10,000 to have been paid is not explained. Plaintiffs responded to my question that the $8,000 was the amount FQC received after payment of the contractors. That does not square with his testimony in which he stated that he gave Debtor $3,000 after paying the subcontractors.

[3] The $15,000 initial payment was used for labor to demolish the Florida room, container fees ($2,500) and materials. The $3,000 subsequent payment was used for materials, Debtor agreeing to advance the labor and "pick it up later." Debtor could not recall the use of the final $1,000 payment.

[4] The only qualification was weather.

due at the end of the job.  Working backwards from a total price of $38,960, John subtracted the amounts he paid to FQC and directly to the subcontractors, concluding that there was only $5,023.00 left to be paid to FQC and not the $9,670 contemplated by the Agreed Proposal.[5]  John could not recall any response from Debtor but noted that he stopped coming to the work site in April.  Midway through April two workmen at the site walked off the job stating that FQC had gone out of business.  John claimed that materials that were on the premises were removed by the workers.  Plaintiffs' job was not completed as evidenced by photographs taken by Plaintiffs on April 21, 2005.  Exhibit P-7.  Moreover when John had the electric, plumbing and framing work inspected, he found it was not up to Code. He claims that the "guys weren't licensed" as represented.

Not surprisingly, the account of the Borchardt's job as described by Debtor is somewhat different.  He outlines certain changes demanded by Plaintiffs which upset the contemplated work schedule.  Debtor had agreed to expand the work to lay a completely new roof on the existing structure (versus one for the addition only) but only at the end of the job out of the final payment when his cash flow would permit.  Plaintiffs wanted it done immediately and retained a subcontractor to do the work in lieu of Debtor which Debtor contends was why John stopped payment on the $10,000 check the day after it was provided. John used $5,000 to pay for the additional roof, held onto $2,000 to make other direct payments and gave Debtor $3,000.  According to Debtor, payment of the other roofer and

---

[5]  Included in this calculation was $3,500 paid on account of  a separate invoice to extend the addition approximately three feet.  While John stated that this was work in the original proposal, I note a separate proposal was issued for it.  Exhibit P-6.  In either case, when the base contract price was $36,460, is not clear why John was working from a $38,900 figure.  Fortunately I do not have to solve this problem because it is not my intention to liquidate the amount of Plaintiffs' claim.

not his failure to pay subcontractors, was the reason for the stop payment.[6]  While Debtor

acknowledges not purchasing the siding for the job, the only material not purchased out of

the contemplated $10,000 of materials costs, he claims that it was not ordered because

the wind and weather would damage it and it was readily available when needed at a local

supply house.  As for the delay in completion, Debtor stated that his agreement was to

complete the work before Plaintiffs' vacation in May or June conditioned on the absence of

problems and there were some.  Delay due to bad weather was exacerbated because Mrs.

Borchardt insisted FQC start with the kitchen work (i.e. inside work) rather than weather

sensitive work, i.e., digging foundations.  Debtor's failure to maintain a constant schedule

at the jobsite was attributed to the fact that John had taken $5,000 contemplated by Debtor

to be used for work other than the roof and paid it to the other roof subcontractor.  With a

cash flow problem, Debtor worked on another job that would pay him cash to make his

payroll.  As for his departure from the job prior to its completion, he agrees with John that

the work reflected in Exhibit P-7 was unfinished but contends that it was mere details,

and the siding was the only real work remaining.  As for the electricians, they were licensed

and the failure to pass tests is customary in the building business due to the variable

requirements of a municipality's unique codes.  Finally only a small amount of sheet

rock valued at less than $150 belonging to Plaintiffs was removed from the jobsite when

Debtor left.  To the extent that John concluded otherwise, he was unaware of FQC's practice

---

[6] Debtor contends he was told by subcontractors that they were not getting paid.  Debtor says he paid everyone but no longer has the records of his business which is no longer operating.  Thus, we have the proverbial swearing contest, the outcome of which is determined by credibility. Fortunately where the truth of this matter lies is not dispositive of the issue before me as I will discuss below.

of storing materials of other jobs at the premises.

On rebuttal John disputes Debtor's account. He said there was about 4-5 days of work to be done, that other materials had to be purchased to replace lumber, insulation, sheet rock, screws and nails removed, that $8,000 went to Debtor, not $3,000 and the inclement weather was only slight when digging foundations. He contends that the real problem was that FQC just did not show up. While Plaintiffs did not produce any evidence as to their costs to replace the allegedly removed materials, a check (regrettably illegible) was introduced to evidence a $4000 payment toward completion of the job. John contends that it cost in excess of $10,000 to correct and complete the contemplated work.[7]

If the resolution of the parties' dispute was governed by state contract law all of the foregoing would be relevant and the trier of fact would have to sort through the claims and counterclaims to determine what really happened on the job. Even if Debtor was the "contractor from hell" as John claims and even if Plaintiffs had proven damages from this experience, Plaintiffs are only entitled to judgment in this Adversary if they prove that (1) the debt is an obligation of Debtor, not merely FQC, and (2) grounds for non-dischargeability of the debt if and when it is liquidated have been established.

**DISCUSSION**

A central purpose of the Bankruptcy Code is to provide a procedure by which the poor but honest debtor can reorder his affairs, make peace with his creditors, and enjoy

---

[7] Presumably this is without reference to the $9670 left on the contract, $5023 of which John acknowledged owing FQC in his conversation with Debtor on April 30th.

"a new opportunity in life with a clear field for future effort, unhampered by the pressure and discouragement of preexisting debt." Local Loan Co. v. Hunt, 292 U.S. 234, 244, 54 S.Ct. 695, 699 (1934). Accord Insurance Co. of America v. Cohn (In re Cohn), 54 F.3d 1108, 1113 (3d Cir. 1995) ("The overriding purpose of the Bankruptcy Code is to relieve debtors from the weight of oppressive indebtedness and provide them with a fresh start."). For this reason, exceptions to discharge are strictly construed against creditors and liberally interpreted in favor of debtors. Id. United States v. Stelweck, 108 B.R. 488, 495 (E.D. Pa. 1989). As the party objecting to discharge, Plaintiffs must prove all of the elements of their section 523(a)(2) claims by a preponderance of the evidence. Grogan v. Garner, 498 U.S. 279, 288-89, 111 S.Ct. 654, 660 (1991).

While the contract that is at issue in this case was with FQC, Plaintiffs seek to hold Debtor individually liable for their damages. The Plaintiffs contend they are entitled to "pierce the corporate veil" to assert their claim against Debtor and/or to hold him directly liable for his conduct in causing their injury. Thus, before addressing whether Plaintiffs have met their burden to establish the elements of § 523(a)(2)(A) and § 523(a)(4), I must determine whether the claim that they make can be asserted against Debtor as opposed to his corporation.

### A.  PERSONAL LIABILITY FOR CORPORATE OBLIGATION

### (1)

The claim at issue arises from a breach of contract. The law in Pennsylvania is clear that where a party enters into a contract with a corporation, no action will lie against the

shareholders of the corporation individually.[8]  First Realvest, Inc. v. Avery Builders, Inc., 410 Pa. Super. 572, 576, 600 A.2d 601, 603 (1991).  Shareholders are not liable absent the successful assertion of a participation theory or piercing of the corporate veil.

There is a strong presumption in Pennsylvania against piercing the corporate veil. Lumax Industries, Inc. v. Aultman, 543 Pa. 38, 41-43, 669 A.2d 893, 895 (1995). When making the determination of whether to pierce the corporate veil, the court "must start from the general rule that the corporate entity should be recognized and upheld, unless specific, unusual, circumstances call for an exception."  Id.  "Care should be taken on all occasions to avoid making 'the entire theory of corporate entity ... useless.'"  Zubik v. Zubik, 384 F.2d 267, 273 (3d Cir. 1967) (quoting Gagnon v. Speback, 389 Pa. 17, 21, 131 A.2d 619, 621 (1957) and Price Bar Inc., Liquor License Case, 203 Pa. Super. 481, 484, 201 A.2d 221, 222 (1964)).  As a general rule, a corporation will be regarded as an independent legal entity, even if its stock is owned entirely by one person.  Lumax, 543 Pa. at 42, 669 A.2d at 895. Thus, the mere fact that the owner of a corporation was the only person involved in its operations is not a sufficient basis for piercing the corporate veil to hold the owner personally liable for corporate debt.  Id.

Notwithstanding the foregoing, a court will not hesitate to treat as identical the corporation and the individuals owning all its stock and assets whenever justice and public policy demand and when the rights of innocent parties are not prejudiced thereby nor the theory of corporate entity made useless:

---

[8] As the parties cite Pennsylvania law, I assume they do not disagree with my conclusion that it is the state law governing this dispute.

This legal fiction that a corporation is a legal entity separate and distinct from its shareholders was designed to serve convenience and justice, ... and will be disregarded whenever justice or public policy require and where rights of innocent parties are not prejudiced nor the theory of the corporate entity rendered useless.... [W]henever one in control of a corporation uses that control, or uses the corporate assets, to further his or her own personal interests, the fiction of the separate corporate identity may properly be disregarded.

Ashley v. Ashley, 482 Pa. 228, 237, 393 A.2d 637, 641 (1978).

In deciding whether to pierce the corporate veil, courts are "basically concerned with determining if equity requires that the shareholders' traditional insulation from personal liability be disregarded and with ascertaining if the corporate form is a sham, constituting a facade for the operations of the dominant shareholder." The Village at Camelback Property Owner's Association v. Carr, 371 Pa. Super. 452, 461, 538 A.2d 528, 533 (1988) (citing Carpenter's Health and Welfare Fund v. Ambrose, 727 F.2d 279 (3d Cir.1983)). The inquiry accordingly focuses on whether corporate formalities have been observed and corporate records kept, whether officers and directors other than the dominant shareholder himself actually function, and whether the dominant shareholder has used the assets of the corporation as if they were his own. Id.; Ashley, 482 Pa. at 237, 393 A.2d at 641.

The principal evidence that Plaintiffs have elicited in support of their request that I pierce the corporate veil is that Debtor owned and controlled FQC. As stated above, this fact without more is not sufficient to hold him individually liable. Unlike the facts of Hanrahan v. Audubon Builders, Inc., 418 Pa. Super. 497, 614 A.2d, 748 (1992), there is no evidence that Debtor commingled the finances of the corporation with his own or used the assets for his personal benefit. Debtor was simply not asked whether corporate formalities

-10-

were maintained or anything about the financial affairs of the corporation.  Debtor stated that

it was his practice to have contracts with his subcontractors although he kept no records after

disbanding FQC.  However, each of the proposal documents was presented on a corporate

form, Exhibits P-1, 3 and 6, and John's check for $15,000 was made to FQC.  While Debtor

acknowledged operating a prior corporation for 3-1/2 years that also did construction

work, that entity was dissolved when Debtor's wife, the other shareholder, retired from

the business.  According to Debtor's unrefuted testimony, the dissolved company had no

outstanding creditors nor claims asserted against it.  Piercing the corporate veil is an

extraordinary remedy.  On this record, it will not be applied.

(2)

Piercing of the corporate veil is distinguished from liability under a participation

theory, i.e., an attempt to assess direct liability in tort against a person acting as an

officer or director of a corporation. Camelback, 371 Pa. Super. at 462, 538 A.2d at 533.[9]

While Pennsylvania law recognizes this theory of liability, it is limited to acts of

misfeasance, not mere nonmisfeasance, i.e., the omission of an act which a person ought to

---

[9] The Court explains by quoting Wicks v. Milzoco Builders, Inc., 503 Pa. 614, 470 A.2d 86
(1983), as follows:

> There is a distinction between liability for individual participation in a wrongful act
> and an individual's responsibility for any liability-creating act performed behind the
> veil of a sham corporation.  Where the court pierces the corporate veil, the owner is
> liable because the corporation is not a bona fide independent entity; therefore, its acts
> are truly his.  Under the participation theory, the court imposes liability on the
> individual as an actor rather than as an owner.  Such liability is not predicated on a
> finding that the corporation is a sham and a mere alter ego of the individual corporate
> officer.  Instead, liability attaches where the record establishes the individual's
> participation in the tortuous activity.

Id.

do. 371 Pa. Super at 463, 538 A.2d at 533. Plaintiffs argue that Debtor is liable for the misfeasance of a corporate act in which he participated, citing Loeffler v. McShane, 372 Pa. Super. 442, 539 A.2d 876 (1988). In Loeffler, the court found that a corporate officer may be held personally liable for promises or representations made other than in his capacity as officer. Liability was grounded in tort, not contract for which no action lies.

Plaintiffs have charged Debtor with fraudulent misrepresentation and embezzlement, torts for which liability could lie against him individually if proven that he acted other than in his capacity as owner/officer of FQC. I thus turn to analysis of those charges in the context of the exception to discharge for which the allegations are directed.

## B.  SECTION 523(a)(2)(A)

Section 523(a)(2)(A) excepts from discharge any debt "for money, property, services" obtained by false pretenses, a false representation or actual fraud. 11 U.S.C. § 523(a)(2)(A). In order to succeed on a claim under § 523(a)(2)(A) based upon a false representation or false pretenses, the creditor must establish by a preponderance of the evidence the following:

(1)     that the debtor made a representation or committed an act;
(2)     that at the time the debtor knew it was false or contrary to his true intentions;
(3)     that he made the representation or committed the act with the intention and purpose of deceiving the creditor;
(4)     that the creditor relied on such representation or act; and
(5)     that the creditor sustained the alleged loss and damages as a proximate result of the false representation or fraudulent act.

Woodstock Housing Corporation v. Johnson (In re Johnson), 242 B.R. 283, 289 (Bankr. E.D. Pa. 1999); Mega Enterprises, Inc. v. Lahiri (In re Lahiri), 225 B.R. 582, 587 (Bankr. E.D. Pa. 1998). See also Field v. Mans, 516 S.Ct. 59, 116 U.S. 437, 444 (1995). Because it is unlikely that a defendant would admit to acting in a fraudulent manner or intending to

deceive a creditor, courts have held that "fraud may be proven by direct or circumstantial evidence." Lipka v. Donley (In re Donley), 115 B.R. 502, 503 (Bankr. E.D. Pa. 1990); First Baptist Church v. Maurer (In re Maurer), 112 B.R. 710, 713 (Bankr. E.D. Pa. 1990).

"Deceit, deliberate nondisclosure, or the omission of material facts renders a debtor as culpable as an intentional false affirmation." Ahwesh v. George (In re George), 1991 WL 208818 at *5 (W.D. Pa. Oct. 8 1991).  See also Wolstein v. Docteroff (In re Docteroff), 133 F.3d 210, 216 (3d Cir. 1997) (reasoning that a finding of fraud for purposes of § 523(a)(2)(A) may be predicated on a debtor's failure to disclose a material fact); Wheeling Wholesale Grocery Company v. Piccolomini (In re Piccolomini), 87 B.R. 385, 387 (Bankr. W.D. Pa. 1988) ("A deliberate nondisclosure of a material fact is just as culpable as an intentional false affirmation.").

Section 523(a)(2)(A) also provides that debts for monies obtained through actual fraud are excepted from discharge.  Congress by adding "actual fraud" to § 523(a)(2)(A) in 1978 as a ground for exception to discharge intended to codify current case law, specifically Neal v. Clark, 95 U.S. 704 (1887), which interprets "fraud" to mean actual or positive fraud rather than fraud implied by law.  (124 Cong. Rec. H11095-96 (daily ed. September 28, 1978)).  Fraud under § 523(a)(2)(A) includes only those acts proven to involve "moral turpitude or intentional wrong and does not apply to fraud implied in law which may occur in the absence of bad faith or immorality."  United States v. Stelwick (In re Stelwick), 86 B.R. 833, 846 (Bankr. E.D. Pa. 1988).

Failure of a commitment made in good faith to make payment does not constitute

-13-

actual fraud.  Neither representations of facts that will exist in the future nor mere promises,

though false and intended to deceive, afford the basis of actionable fraud.  3 Collier on

Bankruptcy, ¶ 523.08[5] at 523-59 (15th ed. 1993).  The mere breach of a contract does not,

without more, imply the existence of actual fraud.  Hein v. Emery (In re Hein), 52 B.R. 68,

70 (Bankr. E.D. Pa. 1985) (citing cases).

Plaintiffs contend that Debtor induced Plaintiffs into the contract upon promises that

he could not keep regarding time and quality of performance.  They specifically refer to

misrepresentations concerning the credentials of his subcontractors and the likely ability to

meet the agreed budget.  They claim they relied on his representations to enter the contract

and were harmed thereby.

Analyzing the representations that Debtor made to induce Plaintiffs to enter the

contract, it is clear that Debtor stated that his business was qualified to do the work.  While

John contends that Debtor overstated his competence, notably John did nothing to verify that

representation. He did not pursue references which is a reasonable precaution when hiring

a contractor.  Indeed Plaintiffs decision to proceed with Debtor was motivated by his

relationship with John's employer and his conclusion that Debtor's subcontractors looked

like they knew what they were doing when they examined the job.  Having done nothing to

verify FQC's track record, Plaintiffs cannot state that they reasonably relied on Debtor's

expertise in going ahead with this project.

John also testified that Debtor falsely represented that his subcontractors were

licensed.  To the extent Plaintiffs relied on such representation, the evidence does not prove

that they were not.  John testified that someone told him the subcontractors were unlicensed,

a third party allegation that was denied by Debtor.  Moreover, Plaintiffs did not establish that the inability to secure municipal approvals was a result of subcontractor licensing deficiencies, an allegation disputed by Debtor who claimed that it is not uncommon in building for local authorities to reject work.  Nonetheless John testified, without rebuttal, that much of the work had to be redone to secure the inspectors' approvals, and that while Debtor arranged for the remedial work, John had to pay them outside the contract.  From the record made, I cannot conclude whether the subcontractors were or were not licensed and whether the deficiencies in the work were attributable to their lack of credentials or poor workmanship.  More significantly, I do not understand how Debtor can be held personally liable for the poor workmanship of the subcontractors he retained.  Certainly FQC had a responsibility to provide competent labor but I find no basis to hold Debtor individually liable for FQC's retention of  workers whose performance was substandard without some evidence that Debtor knew they were unqualified and put them on the job anyway.

Aside from the quality of the work, the focus of John's complaints was on the untimeliness and failure to complete the project.  Debtor and John disagree on their understanding of when the job would be completed.[10]  Even if Debtor led John to believe he could get it done in two months, weather permitting, that schedule assumed that he had the discretion to perform the tasks constituting the job in a sequence that maximized the use of good weather and the availability of cash flow to purchase materials and labor.  Again the

---

[10] John stated Debtor agreed to get the work done in two months; Debtor contends the work had to be completed before Plaintiffs' vacation in May.  Plaintiffs point to the two month timetable as a representation they relied upon which I find no one reasonably could have expected to hold given the changing nature of the job and the reality that construction was contemplated for January and February when weather conditions are especially adverse.

litigants dispute the effect of the weather, neither providing any corroboration.  When John stopped payment on the $10,000 check, the Debtor's tight cash flow became tighter. He stated that he could not afford to pay his subcontractors and therefore left the job site to do work that would generate funds to keep them working.  When Plaintiffs insisted that the new roof over the existing house be done at the beginning of the job (which Debtor stated he would do without additional cost at the end of the job), his cash flow was further impaired. Plaintiffs went ahead and retained a subcontractor to do the roof work and presumably paid him with part of the retained deposit.  Indeed the Debtor was paid only $2,000 of the $10,000 that was anticipated by the contract to be due upon delivery of materials.  The foregoing circumstances, while not justifying the lack of progress in  completing the job, at least negates Plaintiffs' contention that Debtor fraudulently misrepresented his intention to do the work in two months.  Debtor would have had no way of knowing when he agreed to the contract that Plaintiffs would make unilateral changes to the payment and task schedule. Those changes may have been reasonable and even necessary from Plaintiffs' perspective, and had Debtor been a better contractor, he may have been able to  respond to the requests without effecting the job.  However, inadequate performance is breach of contract, not fraud.

Nonetheless on April 8, Debtor committed to finish the job by April 30, 2004, weather allowing, a promise which John accepted because as he stated, what other choice did he have. The time line of subsequent events is a bit unclear since Debtor and John met after April 30th to discuss the balance of payments.  At that time, John advised Debtor that he could not expect the balance that Debtor thought would be paid to him, i.e., $9,670, but rather he would be paid $5,023.  As noted earlier, I could not conclude whether John was justified in his

position[11] nor do I know whether expectation of the shortfall contributed to Debtor's inability to complete the contract. However, sometime in April, FQC left the job because it went out of business. One would have thought that the subject of completion would have come up in the April 30th conversation between Debtor and John but perhaps the chronology of events described was mistaken. John did take a series of photographs which are date marked as of April 21, and states that this was work never completed. I am not certain if this is all the work not completed or was intended to give me an idea of the extent of the problem on April 21. A review of the photographs of the unfinished work is inconclusive. While they clearly show unfinished work on April 21,[12] there is no context for the eleven photos presented. In the absence of an expert or even testimony of the contractor retained to finish the job, it is impossible to evaluate whether the Plaintiffs have been damaged by any representation that they relied upon.

There is no question that Debtor breached his contract with Plaintiffs by failing to complete the construction work promised and that Plaintiffs had to retain another contractor to complete the job. For this, they would unquestionably have a claim for damages against

---

[11] In the accounting that supported his claim, John appears to have deducted from the amount owed to Debtor $3,500 paid for work outside the scope of the Agreed Proposal.

[12] There are eleven photographs, two of which reflect poor workmanship. One shows damage to the flooring in the back patio; the second shows damage to the garage door. It is impossible to discern from these photographs the extent of the damage, how it occurred or what was needed to do to correct it. The remaining nine photographs show work not completed on April 21: an unfinished wall socket in the living room, the unfinished kitchen ceiling, an open laundry room wall, the back wall of the kitchen which had not been removed, unfinished wall and ceiling (with hanging wires) in laundry room.

FQC. It is also clear that Plaintiffs did not pay Debtor the funds he contemplated receiving to perform the job. On this record, I cannot determine how much more Plaintiffs had to spend in the long run.[13] Fortunately it is not necessary that I liquidate this claim because I find that Plaintiffs have not proven by a preponderance of the evidence that Debtor made representations that at the time he knew to be false upon which Plaintiffs reasonably relied and which were the proximate result of their injury.   Moreover, absent facts not present in this record, the deficiencies in the performance of the subcontractors cannot be attributed to Debtor personally where his retention of them was in his capacity as owner of FQC.   In so concluding, I recognize that  the entire construction experience was extremely aggravating to Plaintiffs. No doubt their frustration is only exacerbated by the intervention of bankruptcy that restricts their ability to get satisfaction for their bona fide claims.   However, the bankruptcy discharge is an expression of Congressional policy that subordinates the claims of creditors to the Debtor's fresh start except under limited circumstances not proven in this case.

<u>C.  SECTION 523(A)(4)</u>

Section 523(a)(4) excepts from discharge a debt "for fraud or defalcation while acting

---

[13]   What seems possible is that Debtor, who seemingly went along with Plaintiffs' changes, had bid the job wrong.  He was operating on the thinnest of margins so that any small change impaired his ability to get the work done.  When first discussing the project,  he prepared an ideal budget for the work which was rejected by John.  Instead John gave him a price that Plaintiffs could afford and Debtor agreed to work with that budget with Plaintiffs performing some of the work themselves.

in a fiduciary capacity, embezzlement, or larceny." 11 U.S.C. § 523(a)(4).[14]  The terms embezzlement and larceny are to de determined under federal common law.  Nassau Suffolk Limonsine Association v. Jardula (In re Jardula), 122 B.R. 649, 653 (Bankr. E.D. N.Y. 1990).  Embezzlement is defined by federal common law as "the fraudulent appropriation of property by a person to whom such property has been entrusted or into whose hands it has lawfully come."  Moore v. United States, 160 U.S. 268, 269, 16 S.Ct. 294, 295 (1895).

The thrust of the § 523(a)(4) claim is that upon leaving the jobsite, Debtor removed materials paid for by Plaintiffs and contemplated to be used to complete the work on his house.  In support of the allegation, John testified that he observed materials on his property, including lumber, insulation, sheet rock, screws and nails, which he had to replace since they were removed by Debtor's workers.  There was no evidence of such replacement purchases nor the value of the materials allegedly repurchased.  Debtor testified that it was his business practice when he purchased materials for multiple jobs to have them delivered and then stored at one site, removing them as necessary.  He provided no details that this practice was followed in this case.  He stated that he had used all the materials that Debtor had paid for but for a small amount of sheet rock valued at about $150 which was removed.  By its terms an embezzlement was established for $150 of sheet rock.[15]  However, there is no evidence

---

[14]  It is well established that fiduciary capacity need only be proven with fraud or defalcation and is not an element of embezzlement or larceny.  Fox v. Shervin (In re Shervin), 112 B.R. 724, 730 (Bankr. E.D. Pa. 1990).

[15]  Had John been specific about the materials he was allegedly compelled to repurchase and his observation of them on the property only to be missing when FQC left, he might have proven more than a *de minimus* embezzlement.  His testimony, however, was very general.

(continued...)

-19-

as to who removed the material.  John testified that Debtor had stopped coming to the job site

in April and by the time FQC walked off the job, he was out of the contracting business.

If John was directing or permitting his workers to take the materials, there is no evidence

that he was doing so as an individual versus as an officer of FQC.  Thus, I cannot conclude

that the loss of the sheet rock can be attributed to Debtor under a participation theory so as

to even except that small claim from discharge under § 523(a)(4).

Because Plaintiffs have not proven an embezzlement claim against the Debtor

personally, no judgment will enter under §523(a)(4) either.  An Order will be entered

consistent with the foregoing Memorandum Opinion.


_____
        DIANE WEISS SIGMUND
        Chief U.S. Bankruptcy Judge

Dated:    June 14, 2006

---

[15](...continued)
Since Debtor concurs that the dedicated sheet rock was unused and since it was removed, I have
concluded the embezzlement occurred to that extent only.

# UNITED STATES BANKRUPTCY COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| In re | : | Chapter 13 |
| | : | |
| JOHN FERRELL, SR., | : | Bankruptcy No. 04-30731DWS |
| aka John Ferrell, | : | |
| | : | |
| Debtor. | : | |

_____

| | | |
|---|---|---|
| | : | |
| JOHN BORCHARDT, | : | Adversary No. 04-1034 |
| MICHELLE BORCHARDT, | : | |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | |
| JOHN FERRELL, SR., | : | |
| aka John Ferrell, | : | |
| | : | |
| Defendant. | : | |

_____

\

# ORDER

**AND NOW**, this 14th day of June 2006, upon consideration of the Complaint of John

and Michelle Borchardt ("Plaintiffs") seeking an exception to the discharge of their claim

against Debtor for damages incurred in connection with certain renovations contracted for

but not performed on their residence, after notice and hearing and for the reasons stated in

the accompanying Memorandum Opinion;

It is hereby **ORDERED** that judgment is entered for Debtor and against the Plaintiffs.

_____
DIANE WEISS SIGMUND
Chief U.S. Bankruptcy Judge

Copies to:

Gary S. Auerbach, Esquire
212 North Main Street

Suite 204
North Wales, PA  19454

Adolph F. Fellmeth, Esquire
777 American Drive
Bensalem, PA  19020

William C. Miller, Esquire
Standing Chapter 13 Trustee
P. O.  Box 40119
Philadelphia, PA 19106-0119

Dave P. Adams, Esquire
Office of the U.S. Trustee
833 Chestnut Street
Suite 500
Philadelphia, PA 19107